UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

HECTOR & EUGENIA GAMBOA,          §
                                 §
        *Plaintiffs*,            §
                                 §
v.                               §          CIVIL ACTION H-14-1273
                                 §
CENTRIFUGAL CASTING MACHINE CO.,  §
                                 §
        *Defendant*.             §

## MEMORANDUM OPINION & ORDER

Pending before the court are (1) defendant Centrifugal Casting Machine Company's ("Centrifugal") motion to strike Plaintiffs' experts Dan Bagwell and David Altman (Dkt. 47) and (2) Centrifugal's second motion for summary judgment (Dkt. 48). Having considered the motions, responses, replies, and applicable law, the court is of the opinion that the motions should be DENIED.

## I. BACKGROUND

On May 30, 2013, plaintiff Hector Gamboa ("Mr. Gamboa") was injured at work while employed by Bearings Plus, Inc. in Houston, Texas. Dkt. 51 at 1. At the time of his injury, Mr. Gamboa was operating a centrifugal casting machine ("the Machine") that Centrifugal designed, manufactured, marketed, and sold. Dkt. 48 ¶ 1. Mr. Gamboa alleges that, while he was operating the Machine, a bearing ring became loose. Dkt. 51 at 1. A part of the Machine then struck Mr. Gamboa and molten metal spilled onto his body. *Id.* at 1, 4-5. As a result of the incident, Mr. Gamboa suffered broken bones and third-degree burns. *Id.* at 1.

On February 26, 2014, Mr. Gamboa and his wife, Eugenia Gamboa ("Ms. Gamboa") (collectively, "Plaintiffs") filed suit against Centrifugal in Texas state court. Dkt. 1, Ex. A.

Plaintiffs brought strict products liability claims for defects in design, manufacturing, and marketing of the Machine, as well as claims for negligence and gross negligence. *Id.* at 3-8.  On May 8, 2014, Centrifugal removed the case to this court.  Dkt. 1. On December 2, 2014, Centrifugal filed its first motion for summary judgment.  Dkt. 24.  The court granted partial summary judgment in favor of Centrifugal on the manufacturing defect claim after Plaintiffs conceded that they had no evidence to support the claim.  Dkt. 36.  The court denied the remainder of the motion without prejudice.  *Id.* Centrifugal now moves for summary judgment on the remaining claims.  Dkt. 48.

The court set initial expert designation deadlines of September 15, 2014, for Plaintiffs and January 15, 2015, for Centrifugal.  Dkt. 9.  After granting an agreed motion and Plaintiffs' opposed motion to extend expert deadlines, the court reset the expert designation deadlines to November 30, 2014, for Plaintiffs and March 30, 2015, for Centrifugal.  Dkts. 17, 18, 36.  Plaintiffs filed their designation of expert witnesses on October 16, 2014.  Dkt. 21, Ex. A.  However, Plaintiffs did not produce the joint expert report for their retained life care plan experts, David Altman and Dan Bagwell, until March 20, 2015.  Dkt. 47, Ex. A.  Centrifugal now moves to strike Altman and Bagwell.  Dkt. 47.  Trial is set for December 14, 2015.  Dkt. 61.

## II. LEGAL STANDARD AND ANALYSIS

### A.    Centrifugal's Motion to Strike Plaintiffs' Experts Dan Bagwell and David Altman

In cases where federal subject matter jurisdiction is based on diversity, state law governs substantive matters while federal law governs procedure.  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817 (1938); *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 395 (5th Cir. 2003).  This court applies the Federal Rules of Civil Procedure to matters governed by those rules.  *Rosales v. Honda Motor Co.*, 726 F.2d 259, 261-62 (5th Cir. 1984); *Johnson's Estate v. Bellville Hosp.*, 56

F.R.D. 380, 384 (S.D. Tex. 1972) (Seals, J.).   The Rules set forth a party's obligations when employing expert testimony.

When an expert has been retained or specially employed to provide expert testimony, Federal Rule of Civil Procedure 26 requires a party's expert disclosure to be accompanied by a written report. Fed. R. Civ. P. 26(a)(2)(B).  Here, Plaintiffs did not produce a written report for Altman and Bagwell with their expert disclosures.  Rather, Plaintiffs produced Altman and Bagwell's expert report on March 20, 2015, nearly four months after Plaintiffs' November 30, 2014, expert disclosure deadline.  Dkt. 47, Ex. A.  Therefore, Plaintiffs have violated Rule 26.

Where a party fails to provide information required by Rule 26(a), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  For those failures that are not substantially justified or harmless, this sanction is "self-executing" and "automatic." Fed. R. Civ. P. 37(c)(1), Advisory Comm. Note (1993).  To determine whether a failure to comply with Rule 26(a) is substantially justified or harmless, the court considers four factors: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose."  *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 563-64 (5th Cir. 2004) (citation and internal quotation marks omitted).

### 1.      Importance of the Evidence

Plaintiffs indicate that they need Altman and Bagwell's testimony to prove damages.  Dkt. 49 at 3.  Centrifugal does not argue that this evidence is unimportant.  If Plaintiffs' succeed, Altman and Bagwell's expert report suggests that a significant portion of Plaintiffs' damages stem from life care expenses.  *See* Dkt. 47, Ex. A at 30 (estimating a life time cost total of $1,115,509.31).  The expert

3

report therefore is a key part of Plaintiffs' damages evidence.  This factor weighs in favor of including the expert report.  *See Betzel v. State Farm Lloyds*, 480 F.3d 704, 707-08 (5th Cir. 2007) (finding that the importance of the challenged expert testimony weighed in favor of inclusion where the testimony was necessary for plaintiff to prove damages).  The importance of this testimony, however, "cannot singularly override the enforcement of local rules and scheduling orders." *Geiserman v. MacDonald*, 893 F.2d 787, 792 (5th Cir. 1990).

### 2.        Prejudice to the Opposing Party

Centrifugal argues that it has been prejudiced by Plaintiffs' significant delay in producing Altman and Bagwell's expert report.  Dkt. 47 ¶ 6.  In particular, Centrifugal notes that the expert report was produced only ten days prior to Centrifugal's expert designation deadline of March 30, 2015.  *Id.*  In response, Plaintiffs argue that Centrifugal suffered no prejudice because it was able to depose the experts and had adequate time to prepare for the deposition.  Dkt. 49 at 3-4.

A party's delay in filing an expert report "disrupt[s] the court's discovery schedule and the opponent's preparation."  *Geiserman*, 893 F.2d at 791.  Therefore, significant delay may be prejudicial to the opposing party.  Courts often find late expert designations prejudicial where the delay interferes with the opposing party's opportunity to depose the expert.  *See, e.g., id.* at 791-92 (affirming district court's decision to strike untimely expert designation where opposing party complained that he would be unable to prepare for and take the expert's deposition before the discovery deadline); *Bradley v. United States*, 866 F.2d 120, 125 (5th Cir. 1989) (reversing district court's decision not to strike untimely expert designations where opposing party was forced to depose the experts a few days before trial).  By contrast, in this case, Plaintiffs' delay did not interfere with Centrifugal's ability to depose Plaintiffs' experts.  Although Plaintiffs did not produce an expert report until March 20, 2015, discovery remained open until June 5, 2015.  Dkt. 39.

4

Centrifugal had over a month to prepare for its depositions of Bagwell and Altman, which were held on April 27, 2015.  Dkt. 50, Exs. A, B.

Further, this case is distinguishable from those cases where an expert is revealed immediately before trial.  *See, e.g.*, *Bradley*, 866 F.2d at 123 (noting that opposing party was put at great disadvantage where government moved to designate expert witnesses ten days before trial); *Robbins v. Ryan's Family Steak Houses E., Inc.*, 223 F.R.D. 448, 454 (S.D. Miss. 2004) (striking expert testimony where it was disclosed on the "eve of trial").  In this case, trial is set for December 14, 2015, almost nine months after Plaintiffs filed the expert report at issue.  Dkt. 61.  Therefore, there is no unfair surprise that would prejudice Centrifugal's trial preparations.  *See Primrose Operating Co.*, 382 F.3d at 564 (holding that plaintiffs' failure to disclose information about expert was harmless where plaintiffs informed defendant of the nature of the expert's testimony six months before trial).  Even though Plaintiffs' expert report was produced only ten days before Centrifugal's expert designation deadline, Centrifugal did not find it necessary to request an extension of that deadline.  Moreover, Centrifugal does not assert that the report affected its decision on which experts it would designate.  The court recognizes that Plaintiffs were significantly late in producing Bagwell and Altman's expert report.  Nonetheless, the court finds that Plaintiffs' conduct has not caused Centrifugal any significant prejudice.  Therefore, this factor weighs in favor of including the testimony.

### 3.     Possibility of Granting a Continuance

The court must consider the possibility of granting a continuance to cure any prejudice caused by Plaintiffs' violation of Rule 26.  Centrifugal has stated that it is opposed to a continuance.  Dkt. 50 ¶ 5.  Plaintiffs argue that a continuance is not necessary because the challenged experts have already been deposed.  Dkt. 49 at 3.  In cases involving late-designated witnesses, a continuance

allows a party to depose the witnesses and provides the party additional time to prepare for trial.  *See,* *e.g.*, *Betzel*, 480 F.3d at 708-09 (finding that the district court should have granted a continuance to give defendant an opportunity to depose plaintiff's late-designated experts); *Campbell v. Keystone Aerial Surveys, Inc.*, 138 F.3d 996, 1001 (5th Cir. 1998) (finding that the district court should have considered granting a continuance rather than requiring plaintiffs to depose defendants' late-designated witness during trial).  In this case, however, Centrifugal was able to depose the challenged experts far in advance of trial.  Centrifugal has not experienced sufficient prejudice to necessitate a continuance.  Therefore, a continuance would provide limited value to the parties.  This factor is neutral.

### 4.      Plaintiffs' Explanation

Plaintiffs have explained that their experts were unable to prepare a timely expert report due to significant delays in obtaining Mr. Gamboa's medical records while his treatment was ongoing. Dkt. 49 at 2.  Mr. Gamboa completed his treatment on February 16, 2015, and the expert report was produced about a month later.  *Id.*

Plaintiffs' explanation is unpersuasive.  Plaintiffs could have subpoenaed Mr. Gamboa's medical records at any time.  Additionally, the final medical record reviewed by the challenged experts is dated July 25, 2014.  Dkt. 47, Ex. A at 9.  This fact undermines Plaintiffs' explanation because the experts did not rely on any more recent medical records in coming to their conclusions. Therefore, it is unclear why Plaintiffs' experts waited until March of 2015 to review medical records created in July of 2014.  Because the court finds no legitimate justification for Plaintiffs' delay, this factor weighs in favor of excluding the testimony.

A review of the four factors listed above weighs in favor of including Altman and Bagwell's expert testimony.  Although Plaintiffs' failure to comply with Rule 26 was not substantially justified,

it was harmless.  The court will not impose a sanction that would cause significant damage to Plaintiffs' case where Plaintiffs' failure has caused Centrifugal no measurable prejudice.  *See Betzel*, 480 F.3d at 709 (reversing district court's exclusion of late-designated damages experts because exclusion imposed "the extreme end of the sanction spectrum . . . against the lowest end of the prejudice spectrum").  Therefore, Centrifugal's motion to strike Bagwell and Altman is DENIED.

**B.**     **Centrifugal's Second Motion for Summary Judgment**

Centrifugal moves for summary judgment on all of Plaintiffs' claims.  Dkt. 48.  In considering Centrifugal's motion, the court applies Texas substantive law and federal procedural law.  *Erie R.R. Co.*, 304 U.S. at 78; *Hall*, 327 F.3d at 395.  Under the Federal Rules of Civil Procedure, a court shall grant summary judgment when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party."  *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).  If the party meets its burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue for trial.  Fed. R. Civ. P. 56(e).  The court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant.  *Envtl. Conservation Org. v. City of Dall.*, 529 F.3d 519, 524 (5th Cir. 2008).

**1.**     **Summary Judgment Evidence**

As a preliminary matter, Centrifugal asks that the court not consider several expert affidavits Plaintiffs have submitted in opposition to the motion for summary judgment.  Dkt. 52 ¶ 4.  Centrifugal argues that these affidavits directly contradict the experts' deposition testimony and

7

contain unsupported conclusory statements. *Id.* ¶¶ 2-3.  Further, Centrifugal argues that Plaintiffs' expert reports should have contained all of the matters to which the experts would testify, and Plaintiffs should not be allowed to provide additional, conflicting information via affidavits after the expert disclosure deadline. *Id.* ¶ 4.

In general, a party may rely on affidavits in opposition to a motion for summary judgment. Fed. R. Civ. P. 56(c) (noting that a party may cite to affidavits to support an assertion that a fact is genuinely disputed).   However, in deciding a motion for summary judgment, the court need not consider conclusory statements set forth in affidavits. *See Lechuga v. S. Pac. Transp. Co.*, 949 F.2d 790, 798 (5th Cir. 1992) ("Conclusory statements in an affidavit do not provide facts that will counter summary judgment evidence, and testimony based on conjecture alone is insufficient to raise an issue to defeat summary judgment.").   Courts have also refused to consider expert affidavits where those affidavits offer opinions that contradict prior testimony or offer entirely new opinions not contained in expert reports. *See, e.g.*, *Buxton v. Lil' Drug Store Prods., Inc.*, No. 2:02-CV-178, 2007 WL 2254492, at *5-6 (S.D. Miss. Aug. 1, 2007), *aff'd*, 294 F. App'x 92 (5th Cir. 2008) (collecting cases where courts refused to consider expert affidavits as summary judgment evidence when affidavits offered new opinions not contained in initial expert reports); *Saudi v. S/T Marine Atl.*, 159 F. Supp. 2d 512, 521 (S.D. Tex. 2001) (Harmon, J.) (holding that expert's self-serving affidavit was incompetent evidence where it contradicted his prior deposition testimony without explanation); *Brumley v. Pfizer, Inc.*, 200 F.R.D. 596, 603 (S.D. Tex. 2001) (Jack, J.) ("A subsequent expert affidavit submitted to rebut a summary judgment motion may be excluded if it differs from an earlier Rule 26 report.").   However, "the court is not required nor is it willing to parse out those portions of the affidavits" that are proper summary judgment evidence and those portions that are improper. *Avance v. Kerr-McGee Chem. LLC*, No. 5:04-CV-209, 2006 WL 3484246, at *6 (E.D.

Tex. Nov. 30, 2006).  Therefore, the court has assumed for the purposes of deciding this motion that

the expert affidavits are improper.  Even without considering Plaintiffs' affidavits, the court finds

that Plaintiffs have raised a genuine issue of material fact for trial.

### 2.      Design Defect

Under Texas law, a strict liability design defect claim requires a plaintiff to prove "that (1)

the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative

design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks

recovery." *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009).

### i.      Unreasonable Dangerousness

To determine whether a  product's design renders it unreasonably dangerous, Texas courts

apply a risk-utility analysis that involves consideration of the following five factors:

> (1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and (5) the expectations of the ordinary consumer.

*Id.*  Plaintiffs need not produce evidence as to all five factors in the risk-utility analysis to succeed

on their claim.  *Shipp v. Gen. Motors Corp.*, 750 F.2d 418, 421-22 (5th Cir. 1985).

Centrifugal argues that Plaintiffs cannot prove the Machine was unreasonably dangerous

because there have been no same or similar accidents with the Machine.  Dkt. 48  ¶ 29.  Evidence

of similar incidents may be relevant to show whether a product is unreasonably dangerous.  *Nissan*

*Motor Co. v. Armstrong*, 145 S.W.3d 131, 138-39 (Tex. 2004).  However, the court is not aware of

any case holding that evidence of similar accidents is required to sustain a design defect claim.  To the contrary, Texas case law suggests that the frequency of similar accidents is not alone dispositive of the unreasonable dangerousness inquiry.  *See, e.g.*, *Hernandez v. Tokai Corp.,* 2 S.W.3d 251, 260 (Tex. 1999) (holding that, in performing the risk-utility analysis, the rarity of the risk is a "relevant" factor to be considered alongside the potential gravity of the harm); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 337 (Tex. 1998) ("While [evidence of few reported accidents] is certainly relevant, and perhaps would persuade many juries, we cannot say that it conclusively establishes that the tire is reasonably safe when weighed against the other evidence.").  Therefore, while the absence of similar accidents is persuasive evidence in Centrifugal's favor, it is not an appropriate basis for summary judgment.

Centrifugal next argues that Plaintiffs have not performed the risk-utility analysis necessary to prove that a product was unreasonably dangerous when sold.  Dkt. 48 ¶ 17; Dkt. 52 ¶ 2. Centrifugal's argument is based on its assertion that Plaintiffs' experts Francisco Godoy, Dennis Scardino, and Gary Richetto "admitted at the time of their depositions that no risk-utility analysis had been done to determine whether the product was unreasonably dangerous when sold."  Dkt. 52 ¶ 2.  As to Mr. Richetto, Centrifugal has not identified, nor has the court found,  any portion of Mr. Richetto's deposition where he made such an admission.  Mr. Scardino was unable to define an "unreasonably dangerous product" and admitted that he did not personally perform an analysis of whether the Machine was unreasonably dangerous.  Dkt. 51, Ex. H. at 61-63.  Mr. Godoy testified that he did not know what an unreasonably dangerous product was, but he also testified that he "did an analysis that this product is very unreasonable [sic] dangerous."  Dkt. 51, Ex. F at 54-55. When asked what he did to determine whether or not the Machine was unreasonably dangerous, he stated:

"After I analyzed this design of this product and I saw that it could have been implemented in a—in a better design. I think it never was implemented to prevent this accident from occurring." *Id.* at 55.

This unclear testimony is hardly sufficient to establish that these experts conducted no risk-utility analysis. They were not questioned about the relative risk and utility of the Machine. Instead, they were questioned about "unreasonable dangerousness," a legal term of art with a particular meaning in products liability law. It is unsurprising that these non-legal experts were unable to define the term. While an attorney may have understood that an unreasonably dangerous product is one that fails a risk-utility analysis, the court does not expect the experts to make that connection. More importantly, Mr. Godoy, Mr. Scardino, and Mr. Lorenzo's joint expert report indicates that they *did* conduct a risk-utility analysis in this case. *See* Dkt. 26, Ex. F1 at 9 ("The absence of a centering boss, the movement of a split pad ring, or the movement of a portion of a split pad ring within the [Machine] during rotation would create an imbalance, which in turn could be detected . . . Affordable vibration detection and monitoring devices are readily available for use in a multitude of applications."); *id.* at 10 ("All of the observed post incident modifications to the [Machine] were technologically feasible at the time that the [Machine] was manufactured. These modifications did not affect the utility or function of the [Machine]."). These experts suggested several alternative designs for the Machine, and Centrifugal has neither produced evidence nor asserted any arguments that these alternatives would have been unduly expensive or would have made the Machine less useful. *See id.* at 10 (suggesting that the water guard should have been reinforced, that the control panel should have been moved to a different location, and that the Machine should have included a system to detect high vibration levels). The report therefore directly addresses the risk-utility factor of "the manufacturer's ability to eliminate the unsafe character of the

product without seriously impairing its usefulness or significantly increasing its costs." *Gish*, 286 S.W.3d at 311.

Plaintiffs have provided evidence in support of their contention that the Machine fails a risk-utility analysis and is unreasonably dangerous. Notably, unreasonable dangerousness is generally a fact question for the jury; it will be decided as a matter of law only where reasonable minds cannot differ. *Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1040 (5th Cir. 2011); *see also Hernandez,* 2 S.W.3d  at 260 ("The determination of whether a product is unreasonably dangerous because of a defective design is often one that involves factual disputes that a party is entitled to have a jury resolve.").  Courts have made the unreasonable dangerousness determination as a matter of law in rare cases, such as where the plaintiff's suggested alternative designs would have "completely precluded some of the uses for which the product was designed." *Hernandez*, 2 S.W.3d at 260.  As stated above, Centrifugal has not argued or produced any evidence that Plaintiffs' proposed designs would have limited the Machine's intended uses.   A juror could properly find the Machine unreasonably dangerous.   Therefore, the court will not decide this question as a matter of law.

### ii.    Safer Alternative Design

To prove that a safer alternative design existed, Plaintiffs must meet a three-prong test by showing that the alternative design "(i) would in reasonable probability have prevented or significantly reduced the risk of the claimant's injury or damage (ii) without substantially impairing the product's utility, and (iii) was economically and technologically feasible when the product was manufactured or sold." *Id.* at 258.  An alternative design is not safer if it would impose an equal or greater risk of harm under other circumstances.  *Martinez*, 977 S.W.2d at 337.

As to the second prong, Plaintiffs' experts indicated in their expert report that their suggested alternative designs would not impair the utility of the Machine.  *See* Dkt. 26, Ex. F1 at 10.

Centrifugal has neither argued nor presented evidence that the suggested alternative designs would interfere with current uses of the Machine.  As to the third prong, Centrifugal has stated that it is not contesting the feasibility of the proposed alternative designs. Dkt. 52 ¶ 6.  Centrifugal has focused its argument on the first prong—in particular, it argues that Plaintiffs' alleged failure to test their proposed alternative designs is fatal to their claim.

Centrifugal argues that "Plaintiffs have no evidence of a safer alternative design since Plaintiffs' experts conducted no testing and thus have no scientific proof as to whether the alleged alternative designs are safer or pose a greater risk." Dkt. 48 ¶ 9.  For this point, Centrifugal relies heavily on the Fifth Circuit's opinion in *Casey v. Toyota Motor Engineering & Manufacturing North America, Inc.*, 770 F.3d 322 (5th Cir. 2014).  In particular, Centrifugal points to the court's broad statement that "Texas law expects that an alternative design be tested before a jury can reasonably conclude that the alternative would prevent or reduce the risk of injury." *Id.* at 332.  In that case, Casey filed a products liability suit against Toyota following a fatal single-car accident. *Id.* at 325. Casey brought a design defect claim based on the alleged inadequacy of the car's side curtain airbag. *Id.*  As evidence of a safer alternative design, Casey introduced a patent application that proposed using a different material for side curtain airbags than the material used in Casey's car. *Id.* at 321. The court held that Casey failed to demonstrate that the proposed alternative design would have prevented or reduced the claimant's risk of injury because Casey's expert did no testing to determine whether the alternative airbag would have changed the result of the accident. *Id.* at 321-22. Casey's expert did not explain why he believed that the alternative design would have withstood the forces in the accident; rather, he relied on the patent application for that conclusion. *Id.* at 332. The court found that the testing in the patent application was "too far afield to constitute evidence that the

alternative design would have reduced the risk of injury in this particular accident" because that testing did not involve forces similar to those in the accident. *Id.* at 322, 332.

The court's decision in *Casey* highlights the evidentiary problems that occur when a party relies on a patent application to prove a safer alternative design. The court found that the patent application provided no evidence that the proposed alternative design had been implemented or even could be implemented. *Id.* at 334. In reaching its decision, the *Casey* court looked to cases in similar contexts. *See, e.g.*, *Gen. Motors Corp. v. Harper*, 61 S.W.3d 118, 126 (Tex. App.—Eastland 2001, pet. denied) (holding that patent failed to show alternative seatbelt design was safer where plaintiff's expert "admitted that the benefits claimed in the patents were not necessarily accurate, workable, or manufacturable"). Unlike in *Casey*, feasibility is not contested in this case. Dkt. 52 ¶ 6. Therefore, there is no similar concern that the proposed alternative designs cannot be implemented.

Further, this case is distinguishable from cases involving airbags and seat belts, which are routinely put through crash testing. Plaintiffs' expert Mr. Godoy testified that physical testing is not the standard in this context. *See* Dkt. 51, Ex. F at 26-28 (acknowledging that the automobile industry does significant crash testing, but explaining that physical testing is not necessary in the context of the engineering analysis applied to this case). Mr. Godoy testified that he performed structural analysis by computer to prepare the calculations for his expert report and that this procedure was accepted in the scientific community. *Id.* at 23-28. Centrifugal has presented no contrary evidence to suggest that physical testing is customary for the type of alternative designs at issue here. Moreover, given that Plaintiffs' expert did conduct testing via computer analysis, this is not truly a case where "no testing" has occurred. Rather, at most, there is a factual question about whether computer testing is sufficient. *Huyser v. Ford Motor Co.*, No. 2:13-CV-280, 2015 WL 296075, at

14

*1 (E.D. Tex. Jan. 21, 2015) (holding that, where plaintiff's expert offered a computer simulation as proof of a safer alternative design, the sufficiency of that method of testing was a disputed issue of fact for the jury).

Most importantly, the Texas Supreme Court has stated clearly that Texas law does not require testing to prove that a safer alternative design existed. *See Genie Indus., Inc. v. Matak*, 462 S.W.3d 1, 7 (Tex. 2015) ("This design need not be actually built and tested; a plaintiff must show only that the alternative design was 'capable of being developed.'"). In *General Motors Corp. v. Sanchez*, the defendant argued that the alternative designs suggested by the plaintiff's expert were inadequate to prove a reduction in the risk of injury because the designs were never tested and therefore the expert's opinion was pure speculation. 997 S.W.2d 584, 590 (Tex. 1999). The Court held that this argument addressed the reliability and admissibility of the expert testimony, not the sufficiency of evidence of a product defect. *Id.* The Court explained that the plaintiff need not test the expert's proposed design changes. *Id.* at 592. The Court relied on the Restatement's position that "qualified expert testimony on the issue suffices, even though the expert has produced no prototype, if it reasonably supports the conclusion that a reasonable alternative design could have been practically adopted at the time of sale." *Id.* (quoting Restatement (Third) of Torts: Products Liability § 2 cmt. f (1998)) (internal quotation marks omitted). The Court found that plaintiff's expert testimony presented sufficient evidence to uphold a design defect verdict. *Id.*

As in *Sanchez*, Plaintiffs in this case have submitted qualified expert testimony regarding whether a safer alternative design existed. As a matter of law, the Texas Supreme Court has stated that such evidence is sufficient to sustain a jury verdict. Therefore, this court cannot grant summary judgment on the ground that Plaintiffs conducted no physical testing in this case.

### iii.    Producing Cause

A plaintiff in a design defect case need prove only that the alleged defect was a "producing cause" of the injury. *Gish*, 286 S.W.3d at 311. A producing cause is "a substantial factor in bringing about an injury, and without which the injury would not have occurred." *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 46 (Tex. 2007).

Centrifugal argues that Mr. Gamboa's decisions, rather than any alleged defects, caused the accident. Dkt. 48 ¶ 29. In particular, Centrifugal points out that Mr. Gamboa did not use the approved "static pour procedure" while operating the Machine. *Id.* Further, Mr. Gamboa used only four of the required six "bosses," which secure the bearing when screwed in. *Id.* ¶¶ 22, 29. However, an injury may have more than one producing cause. *Shipp*, 750 F.2d at 425. Therefore, even assuming Mr. Gamboa's use of unapproved procedures was a cause of the accident, Plaintiffs could still succeed on their design defect claim by proving that the alleged defects were also a producing cause of the accident.

Nonetheless, Centrifugal argues based on *Merrel Dow Pharmaceuticals, Inc. v. Havner* that "[i]f there are other plausible causes of the injury or condition that could be negated, the plaintiff must offer evidence excluding those causes with reasonable certainty." Dkt. 48 ¶ 18 (citing *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 720 (Tex. 1997)). Centrifugal suggests Plaintiffs must actively disprove that Mr. Gamboa's actions contributed to the accident. Unlike this case, *Havner* involved unique issues regarding proof of causation in toxic tort cases. *See Havner*, 953 S.W.2d at 714-17. *Havner* offers no discussion of producing cause. Moreover, *Havner* involved alternative causes; specifically, whether a birth defect was caused by a drug *or* by genetics. *Id.* at 714. By contrast, in this case, Mr. Gamboa's actions and the alleged defects could have both contributed to the accident. There is no reason to believe that these causes could not co-exist. In

16

fact, Texas products liability law specifically contemplates that a design may be defective even where the consumer's misuse also contributed to the accident. *See Hernandez*, 2 S.W.3d at 257-58 (noting that alleged misuse of a product is a factor that may be considered in allocating responsibility for an injury, but misuse is not an absolute bar to liability for defective design). Therefore, Mr. Gamboa's alleged failure to follow approved procedures does not alone defeat Plaintiffs' design defect claim. Further, requiring Plaintiffs to disprove all other possible causes would effectively defeat the rule that an injury may have multiple producing causes. *See Shipp*, 750 F.2d at 425 (holding that it would be improper to require a design defect plaintiff to prove that the defect was the "*sole* producing cause" of her injury, where Texas law requires only that the defect be a "contributing cause . . . *in connection with any other cause or causes*" (citation and internal quotation marks omitted)). Therefore, Plaintiffs' failure to rule out all other possible causes does not defeat their design defect claim.

Centrifugal also argues that Plaintiffs have produced no evidence that the failure to employ an alternative design caused the accident. Dkt. 48 ¶ 29. However, causation need not be supported by direct evidence; rather, circumstantial evidence and reasonable inferences therefrom are sufficient. *Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1044 (5th Cir. 2011) (citation omitted). Plaintiffs have produced expert testimony that, had Plaintiffs' suggested alternative designs been implemented, Mr. Gamboa would likely not have been injured. *See* Dkt. 26, Ex. F1 at 10 ("An alternative positioning of the control panel for the [Machine] most likely would have prevented Mr. Gamboa from being struck by the ejected materials."); *id.* ("If the [Machine] had incorporated a vibration detection/monitoring system . . . and it was interlocked with the drive mechanism; then the subject incident most likely would have been averted . . . ."). Centrifugal has offered no

17

contradictory evidence to suggest that the injuries would have occurred even with the alterative designs in place.

Further, "causation generally is a question of fact for the jury." *Goodner*, 650 F.3d at 1044. A court should rule as a matter of law on the causation question only if "all the facts and inferences point so strongly against causation that no reasonable jury could find causation." *Id.* A juror could infer that, had one or all of the proposed alternative designs been in place, Mr. Gamboa would not have been injured. For example, a juror could infer that, had the control panel been placed in a different location, Mr. Gamboa would not have been in a position to be struck by the flying debris and molten metal pouring from the Machine. Such an inference would not be unreasonable as a matter of law. Therefore, the court finds that there is at least a genuine issue of fact on the subject of causation.

### 3.    Marketing Defect

"A defendant's failure to warn of a product's potential dangers when warnings are required is a type of marketing defect." *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 382 (Tex. 1995). A defendant will be held liable on a marketing defect claim if the lack of adequate warnings renders the product unreasonably dangerous. *Id.* A marketing defect claim requires proof of five elements:

> 1) a risk of harm that is inherent in the product or that may arise from the intended or reasonably anticipated use of the product must exist; 2) the product supplier must actually know or reasonably foresee the risk of harm at the time the product is marketed; 3) the product must possess a marketing defect; 4) the absence of the warning and/or instructions must render the product unreasonably dangerous to the ultimate user or consumer of the product; and 5) the failure to warn and/or instruct must constitute a causative nexus in the product user's injury.

*USX Corp. v. Salinas*, 818 S.W.2d 473, 482-83 (Tex. App.—San Antonio 1991, writ denied).

Centrifugal has raised several arguments in response to Plaintiffs' marketing defect claim.

i.     **No Evidence**

Centrifugal argues that Plaintiffs have no evidence to support their claim that a marketing defect rendered the Machine unreasonably dangerous and no evidence that the alleged defect was a producing cause of Mr. Gamboa's injury.  However, the record contains evidence that supports Plaintiffs' marketing defect claim.  Centrifugal's corporate representative Jesse Harris testified that Centrifugal was aware that its training manual rarely reached end users of the Machine.  Dkt. 51, Ex. A at 31-32.  Further, Mr. Gamboa testified that he did not read any training materials.  Dkt. 48, Ex. C at 14.  He also testified that he received no training on the Machine and was told to "figure out how to run that machine."  *Id.* at 26.  He stated that he always used two of the three centering bosses to align the bearing.  *Id.* at 31.  There is, however, contradictory testimony.  *See* Dkt. 48, Ex. B at 11-12 (deposition of Alfred Ontiveros) (stating that he trained Mr. Gamboa on the Machine, that he made Mr. Gamboa aware that he should use all three centering bosses, and that he allowed Mr. Gamboa to look at the user manuals in his office).  Therefore, there is conflicting evidence regarding whether the warnings adequately informed Mr. Gamboa of the dangers of the Machine.  The jury is entitled to make credibility determinations and decide these disputed issues of fact.  The jury could reasonably find that the warnings offered by Centrifugal were insufficient to give end users reasonable notice of the dangers of the Machine.

With respect to causation, Plaintiffs have offered evidence that alternative warnings would have prevented the accident in this case.  *See* Dkt. 42, Ex. G-1 at 4-6 (expert report of Gary M. Richetto) (stating that Centrifugal should have affixed an on-product warning label that contained several warnings regarding proper use of the Machine, and taking the position that Mr. Gamboa would have heeded those warnings).  Where a manufacturer fails to give adequate warnings, there is a rebuttable presumption that adequate warnings would have been heeded.  *Magro v. Ragsdale*

19

*Bros.*, 721 S.W.2d 832, 834 (Tex. 1986); *see also Gen. Motors Corp. v. Saenz ex rel. Saenz*, 873

S.W.2d 353, 360 (Tex. 1993) ("A warning which is not displayed with sufficient prominence to give

reasonable notice to the persons to whom it is directed is hardly better than no warning at all. If

GM's warning against overloading in this case [was] not sufficiently prominent, plaintiffs would be

entitled to the presumption that reasonable notice would have been heeded.").  A jury could find that

the warnings provided in Centrifugal's training manual were not sufficient to give reasonable notice

to the end user.  In that case, Plaintiffs would be entitled to a rebuttable presumption that an adequate

warning would have been heeded.  Centrifugal has offered no evidence that would negate the

presumption of causation or that suggests Mr. Gamboa would have ignored a prominent, on-product

warning.  Therefore, there are at least disputed factual issues regarding whether the warnings were

adequate and whether alternative warnings would have prevented Mr. Gamboa's accident.

### ii.    Open and Obvious

Centrifugal argues that all of the alleged defects on the Machine were open and obvious, and

therefore Centrifugal had no duty to warn as a matter of law. Dkt. 48 ¶¶ 9, 32, 36.  A manufacturer

is not required to warn of obvious risks.  *Shears*, 911 S.W.2d at 382-83.  The court decides whether

a risk is open and obvious as a matter of law under an objective standard.  *Id.* at 383.  The

obviousness of the risk is determined from the perspective of the average user of the product.  *Sauder*

*Custom Fabrication, Inc. v. Boyd*, 967 S.W.2d 349, 349 (Tex. 1998).  In support of its argument,

Centrifugal points to testimony of Plaintiffs' expert Mr. Godoy.  Dkt. 48 ¶ 27.

The following exchange occurred during Mr. Godoy's deposition while discussing three

alternative designs proposed in his expert report:

> Q [Centrifugal's counsel].      Okay. You agree that those three things
> that we just discussed, they're all open and obvious, correct, you can
> see them?

A [Mr. Godoy].                Yes, sir.

Dkt. 51, Ex. F at 60. Mr. Godoy is not qualified to make a legal determination about what is "open and obvious" under Texas law. Therefore, Centrifugal has identified no supportive evidence that the court is required to credit. Moreover, this testimony does not address the relevant issue with respect to the open and obvious argument. The question is not whether the physical characteristics of the product were open and obvious or whether the user "can see them." The question is whether the *risk* posed by the product is obvious to the average user. Centrifugal has pointed to no evidence that the risks posed by the Machine are obvious to the average user. If anything, the testimony in this case suggests that the nature and severity of the risks posed by the Machine were not obvious to its users. *See* Dkt. 48, Ex. C. at 43-44 (deposition of Hector Gamboa) (explaining that he and another employee knew an unbalanced bearing could be "a little dangerous," but stating that they still felt they could do the job safely); *id.* at 40-41 (stating that he had never been made aware of the possibility that a weld might not hold). Therefore, Centrifugal has not established that the risks in this case were open and obvious as a matter of law.

### iii.    Sophisticated User

Centrifugal argues that Mr. Gamboa's employer, Bearings Plus, has specialized training and is a "sophisticated user." Dkt. 48 ¶¶ 9, 32, 36. Therefore, even if a duty to warn existed in this case, Centrifugal states that it met its obligation by warning Bearings Plus, which was responsible for warnings its own employees. *Id.* ¶¶ 32, 36. In some situations, the sophisticated user doctrine excuses a product supplier from warning knowledgeable customers or their employees of the risks associated with use of the product. *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 194 (Tex. 2004). However, "the mere presence of an intermediary does not excuse the manufacturer from warning those whom it should reasonably expect to be endangered by the use of its product."

*Id.* at 185 (citation omitted).  The Texas Supreme Court has held that the product supplier bears the burden to prove that the sophisticated user doctrine applies.  *See id.* at 195 (holding that defendant supplier has the burden to prove that supplier's ordinary legal duty to warn end users of product dangers should not be applied).  Centrifugal therefore must prove that the sophisticated user doctrine applies.

In support of its argument, Centrifugal points out that Plaintiffs' expert Gary Richetto admitted in his deposition that Bearings Plus is a sophisticated user.  Dkt. 52 ¶ 7.  Mr. Richetto stated that he "believed [Bearings Plus] could be described as a sophisticated user" and attempted to offer a definition of the term.  Dkt. 48, Ex. G at 18-19.  However, Mr. Richetto is not a legal expert and is not qualified to offer legal opinions.  Mr. Richetto's conclusion about who may be a sophisticated user under Texas law is not entitled to any weight.  Therefore, Mr. Richetto's admission provides little support for Centrifugal's sophisticated user defense.

Centrifugal also notes that Bearings Plus "has an engineering department, has been using these casting machines longer than Defendant has been making them, and made subsequent design changes on their own."  Dkt. 52 ¶ 7.  Even assuming that Bearings Plus is very experienced with centrifugal casting machines, the strength of Bearings Plus's qualifications is not the ultimate issue with respect to the sophisticated user defense.  Rather,

> [t]he issue in every case is whether the original manufacturer has a reasonable assurance that its warning will reach those endangered by the use of its product.  Thus, to avoid liability, a manufacturer must affirmatively prove that the warning given by a third party provided the user with actual, adequate, and specific knowledge of the hazard.

*Coleman v. Cintas Sales Corp.*, 100 S.W.3d 384, 389 (Tex. App.—San Antonio 2002, pet. denied).  Here, Centrifugal was aware that the training manual for the Machine rarely reached the person operating the machine.  Dkt. 51, Ex. A at 31-32.  Therefore, Centrifugal did not have a reasonable

assurance that its warnings would reach those endangered by its product and should not have relied on Bearings Plus to communicate the appropriate warnings. *See Gomez*, 146 S.W.3d at 189 ("[W]hen the purchaser of machinery is the owner of a workplace who provides machinery to employees for their use, and there is reason to doubt that the employer will pass warnings on to employees, the seller is required to reach the employees directly with necessary instructions and warnings if doing so is reasonably feasible."). Centrifugal has not proven that the warnings provided to Bearings Plus were adequate to alert end users like Mr. Gamboa of the Machine's dangers. As a result, Centrifugal's sophisticated user defense fails.

### iv.    No Prior Accidents

Centrifugal argues that Plaintiffs cannot prove that Centrifugal was on notice of the danger posed by the Machine because there have been no prior accidents with the Machine. Dkt. 48 ¶ 9. However, there are many ways for a plaintiff to prove that a product supplier knew or should have known of the dangers of the product, including: "(1) evidence of similar accidents or other complaints; (2) presentation of post-accident warnings; (3) presentation of recall letters; (4) evidence of governmental standards; (5) expert testimony, lay testimony, or documentary evidence to show information about risks available to defendant; and (6) reliance on well-established presumptions." *Salinas*, 818 S.W.2d at 484. Although evidence of prior accidents is one way to prove foreseeability of the danger, it is not required. Therefore, the absence of prior accidents is not dispositive of Plantiffs' marketing defect claim.

### 4.    Negligence and Gross Negligence

Centrifugal argues that Plaintiffs have alleged no negligence other than that the product was defective when sold; therefore, Plaintiffs' negligence theory is "encompassed and subsumed" in their defective product theory. Dkt. 48 ¶ 9. In products liability cases, courts have occasionally refused

23

to give a negligence instruction where the plaintiff's evidence has focused solely on the issue of unreasonable dangerousness.  *See, e.g.*, *Garrett v. Hamilton Standard Controls, Inc.*, 850 F.2d 253, 257-58 (5th Cir. 1988) (holding that, where proof in the case was directed entirely to the issue of whether the product was unreasonably dangerous, district court's refusal to give a negligence instruction was harmless); *Shaun T. Mian Corp. v. Hewlett-Packard Co.*, 237 S.W.3d 851, 857 (Tex. App.—Dallas 2007, pet. denied) (holding that appellants' negligence theories were subsumed in their defective product theories where appellants alleged no conduct other than that relating to unreasonable dangerousness).

It is clear, however, that Plaintiffs generally have a right to bring their action in both strict liability and negligence.  *See Garrett*, 850 F.2d at 255 (noting that Texas law allows a products liability action to be brought under theories of strict liability, breach of warranty, and negligence); *Syrie v. Knoll Int'l*, 748 F.2d 304, 306 (5th Cir. 1984) (explaining that alternative pleading in strict liability and negligence is proper and common). Strict liability and negligence are distinct theories that require a plaintiff to make different showings.  The Texas Supreme Court has explained the distinction as follows:

> The care taken by the supplier of a product in its preparation, manufacture, or sale, is not a consideration in strict liability; this is, however, the ultimate question in a negligence action. Strict liability looks at the product itself and determines if it is defective. Negligence looks at the acts of the manufacturer and determines if it exercised ordinary care in design and production.

*Gonzales v. Caterpillar Tractor Co.*, 571 S.W.2d 867, 871 (Tex. 1978).  Because these theories are legally distinct, the court should rarely find that a plaintiff's negligence allegations are subsumed in the plaintiff's strict liability claims.  The Fifth Circuit has indicated that the bar is very low for a plaintiff to properly raise a negligence issue for the jury:

24

> Frequently, much of the evidence that establishes a jury question of strict liability will establish a jury question of negligent design or marketing. Only when the plaintiff has failed to submit sufficient evidence concerning the manufacturer's conduct in designing, manufacturing, or marketing a product should the court refuse to instruct the jury on a theory of the case presented in the pleadings. The question, then, is whether there was evidence or an offer of proof from which the jury could conclude that the [product] was negligently designed or marketed . . . . In other words, . . . was the issue of [defendant's] conduct in designing or marketing the [product] ever raised?

*Syrie*, 748 F.2d at 309. In this case, Plaintiffs have submitted allegations and evidence that relate to Centrifugal's conduct. As noted above, Centrifugal's corporate representative Jesse Harris testified that Centrifugal was aware the training manual for the Machine often did not reach the person operating the machine. Dkt. 51, Ex. A at 31-32. As a result, Centrifugal implemented a training program, but Harris stated that Centrifugal's customers in this sector rarely purchased the training program. *Id.* at 30-31. A jury could find that Centrifugal acted negligently and unreasonably in failing to educate the Machine's ultimate users on its proper operation when Centrifugal knew these operators rarely received the training manual or attended a training program. Further, the jury could conclude that an accident is reasonably foreseeable where the Machine's operators frequently lack proper training. Even though Plaintiffs' negligence claims certainly raise issues and facts that overlap with their strict liability claims, some commonality is expected and does not require dismissal of their negligence claims. *See Syrie*, 748 F.2d at 307 ("Although a negligence claim and a strict liability claim may share certain similar or common elements, they involve two separate theories of recovery."). After reviewing the evidence and Plaintiffs' allegations, the court finds that Plaintiffs have at least raised the issue of Centrifugal's conduct. Therefore, it would be inappropriate for the court to dispose of Plaintiffs' negligence claims.

As to Plaintiffs' claims for gross negligence, Centrifugal argues only that Plaintiffs' gross negligence claims must fail because Plaintiffs' negligence claims fail as a matter of law. Dkt. 48 ¶¶ 20, 31. Because the court has found that Plaintiffs' negligence claims do not fail, Plaintiffs' gross negligence claims also survive.

### 5.     Loss of Consortium

Centrifugal argues that Ms. Gamboa's loss of consortium claim must fail because it is derivative of Plaintiffs' other claims, which fail as a matter of law. Dkt. 48 ¶ 9. Because the court has held that Plaintiffs' other claims do not fail, Ms. Gamboa's derivative loss of consortium claim survives.

Having reviewed Centrifugal's arguments in favor of summary judgment, the court finds that the motion should be DENIED.

### III. CONCLUSION

Centrifugal's motion to strike Plaintiffs' experts Dan Bagwell and David Altman (Dkt. 47) and Centrifugal's second motion for summary judgment (Dkt. 48) are DENIED.

Signed at Houston, Texas on November 6, 2015.

_____
Gray H. Miller
United States District Judge